# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

WIN NEUGER, an individual;
MARSHALL MANLEY, an individual;
MARSHALL MANLEY, Administrator
of the MARSHALL MANLEY ROTH
IRA; and PETER A. FEINSTEIN, MD,
Director and Trustee of the PETER A.
FEINSTEIN MD PC PROFIT SHARING
PLAN,
     Plaintiffs,

v.

ALAN SALKE, an individual,
     Defendant.

Case No.  2:14-CV-08040-AB (JCx)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**TRIAL DATE: OCTOBER 18, 2016**

     This matter was tried before this Court, sitting without a jury, on October 18-21 and 25, 2016.

Michael D. Dempsey of Dempsey and Johnson, P.C. appeared on behalf of Plaintiffs. Stephen M. Feldman of the Law Offices of Stephen M. Feldman Inc. and Wilfred J. Killian of the Law Offices of Wilfred J. Killian appeared on behalf of Defendant Alan Salke.

Having heard the admissible evidence presented by the parties, the arguments of counsel, and the supplemental briefing, and having considered the demeanor and credibility of the witnesses and all papers and exhibits presented by the parties for purposes of this trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.    FINDINGS OF FACT

### A. THE INSTANT LITIGATION

1. Plaintiffs Win Neuger, Plaintiff Marshall Manley, Plaintiff Marshall Manley, Administrator of the Marshall Manley Roth IRA, and Peter A. Feinstein MD, Director and Trustee of the Peter A. Feinstein MD PC Profit Sharing Plan (collectively "Plaintiffs") bring claims against Defendant Alan Salke for fraud, breach of contract, breach of fiduciary duty, and conversion. Pretrial Conference Order at 3 ("PTCO").

2. The Complaint was filed on October 17, 2014. Dkt. 1. The operative First Amended Complaint was filed on April 7, 2015. Dkt. 29. It brought claims against Alan and Diane Salke for fraud, breach of contract, breach of fiduciary duty, and conversion. PTCO 3. An Answer along with counterclaims were filed on May 3, 2015, but all counterclaims have since been abandoned. Dkt. 34; PTCO at 1. Defendant Diane Salke was dismissed without prejudice from the case on October 20, 2016. Dkt. 139.

3. While the First Amended Complaint did contain a demand for a jury trial, on July 7, 2016, the parties jointly agreed to waive their right to a jury trial and have the matter tried by the Court. Dkt. 108.

4. The Court held a five day bench trial starting on October 18, 2016 that concluded on October 26, 2016. The Court heard testimony from Manley, Feinstein, Hayes, Neuger, Freeman, and Salke. Each party filed Proposed Findings of Fact and Conclusions of Law ("FOF"). Pls.' FOF, Dkt. 155–1; Def.'s FOF, Dkt. 156–1.

5. The parties stipulated to the admissibility of all exhibits that were cited at trial, with one exception which was addressed during trial. *See* Dkt. 146 (joint exhibit list). The Court notes that some exhibits, such as Exhibits 76, 117, 118, and 293 were used at trial without objection but left off the joint exhibit list. The Court assumes this was done inadvertently and has cited to these exhibits.

6. The Court notes that while the parties disagreed over the significance of many facts in the record, there were remarkably few genuine factual disputes.

7. While the parties spent extensive time presenting evidence related to earlier conversations and transactions between the parties, the Court found the vast majority of that evidence to be irrelevant and unhelpful to the resolution of the case. In the Court's view the relevant events can be divided into three time periods: the TW and Simi collections; the Subject Collections; and Plaintiffs' attempts to recover their investments in the Subject Collections, including the Sales and Liquidation Agreement ("S&L") and MOU-Modification Agreement ("MOU").

**B. BACKGROUND OF THE PARTIES AND THEIR RELATIONSHIPS**

8. Plaintiff Win Neuger is an individual who resides in and is a citizen of Minnesota. PTCO at 2.

9. Plaintiff Marshall Manley is an individual who resides in and is a citizen of Florida. *Id.* Marshall Manley's son is named Chasen Manley. Chasen Manley assigned all of his rights and claims related to this case to his father orally and/or in writing. Ex. 175; Trial Tr. Day 1 Afternoon at 53:21–57:18 (Manley).

10. Plaintiff Marshall Manley, Administrator of the Marshall Manley Roth IRA, is an individual who resides in and is a citizen of Florida. *Id.*

11. Peter A. Feinstein MD, Director and Trustee of the Peter A. Feinstein MD PC Profit Sharing Plan, is an individual who resides in and is a citizen of Pennsylvania. *Id.*

12. Defendant Alan Salke is an individual who resides in Beverly Hills, California. *Id.* Alan Salke has a wife named Diane, a daughter named Allegra, and a son named Albert, also known as Bert. Trial Tr. Day 5 Morning at 54:16–55:5 (Salke); Ex. 119.

13. Robert Freeman, doing business as Freeman and Sear ("F&S"), was an antique dealer of ancient coins and other antiquities, located in Los Angeles, California. Trial Tr. Day 4 Afternoon Part II at 9:4–24 (Freeman). Freeman has been selling coins and antiques professionally since 1985. *Id.* at 9:16–18. He is married to Tory Freeman. *Id.* at 30:24.

14. Salke first met Robert Freeman briefly in 1980 and the two became reacquainted in December 2010. Trial Tr. Day 5 Morning at 37:13–25 (Salke). Salke proposed that they use the internet to sell antique coins, but Freeman informed him that many companies

were already doing that. *Id.* at 38:1–18. Shortly thereafter Salke began investing with Freeman. The premise of Freeman's operation at this time was to use his expertise to buy coins in bulk after the recession at wholesale prices, and then sell them later on at retail prices. Trial Tr. Day 3 Afternoon at 82:2–4 (Hayes).

15. Manley has known Salke since the late 1970s. *Id.* at 42:11–43:11. Manley was a practicing lawyer at the time and would later represent Salke in personal and professional matters. *Id.* They eventually became friends, and their families went on vacations to Italy together. Trial Tr. Day 1 Morning at 42:5–9 (Manley). In 2010 Salke reached out to Manley and asked if he knew anyone who might be interested in investing in antique coins. *Id.* at 43:7–22.

16. Manley was also personal friends with Feinstein. Manley introduced Salke and Feinstein because Salke suggested that they may like to get more people involved in buying antique coins, and Manley knew that Feinstein was interested in finding profitable investments. Ex. 73.

17. Neuger was often advised on investments by Elliot Hayes, who acted as his agent and representative for all relevant aspects of this litigation. Trial Tr. Day 4 Morning at 14:12–16 (Neuger). Hayes knew Salke from Salke's work with Sidney Kimmel Entertainment. Salke first pitched him the idea of antique coin investments in early 2011. Trial Tr. Day 3 Afternoon at 79:9–25 (Hayes). Hayes had helped set up a previous deal with an entity from the United Kingdom to invest with F&S's European subsidiary, for which he and Salke shared a closing fee. *Id.* at 108:7–109:8.

18. This litigation concerns investments Plaintiffs made in four coin collections in November and December 2012 known as the Columbus collection, 255 collection, 347 collection, and Roman Chest collection (collectively "Subject Collections"). After Plaintiffs experienced trouble getting paid back for their investments they and Salke signed the S&L with Freeman. Ex. 42. Under the S&L, Freeman agreed to sell the remaining assets, pledge collateral assets to secure his obligations, and make guaranteed payments according to a payment schedule. *Id.*

19.  After Freeman failed to make the guaranteed payments, he entered into the MOU with Plaintiffs and Salke which set a new deadline for payments and gave them title to the collateral assets. Ex. 43. Freeman again failed to comply with his payment obligations, which led Plaintiffs to file a federal civil lawsuit against Freeman, his wife, and F&S, that eventually resulted in a default judgment. *Neuger v. Freeman*, No. 2:13-CV-09332-SVW-AS, 2014 WL 12691617, at *1 (C.D. Cal. May 29, 2014) ("*Freeman Action*") (grant of default judgment, in evidence in as Exhibit 55).

## C.  THE TW AND SIMI COLLECTIONS

20.  On March 2, 2012, Salke emailed Manley and Hayes a solicitation for two collections he called TW and Simi, along with the contracts for these collections. Ex. 75. F&S would purchase the TW collection for $525,000, and the Simi collection for $850,000, and would invest in a subordinated position. *Id.* Salke's email stated that he would act as a representative of the investors and collection agent, and the terms of the contract were the same that the parties had previously used. *Id.*

21.  The only parties to the contracts for the TW and Simi collections were F&S, and Salke "in his capacity as agent for multiple investors ('the AS Partners') . . . ." Ex. 79 at 2, 6. Salke provided copies of these contracts to the individual investor, but he created his own oral or written contract with each investor after determining how much that person was investing. This is an important distinction from the later contracts for the Subject Collections, which were directly between F&S and the individual investor.

22.  Salke instructed Manley and Feinstein to either wire their investments to his personal account, or mail their investment to his home address. Trial Tr. Day 3 Morning at 79:20–21; Exs. 77–78.

23.  Salke agreed to subordinate his claims in the TW and Simi collections to the investors' claims. Exs. 67, 72.2, 97.

24.  The TW and Simi contracts allowed Salke to exercise a "put" on behalf of the investors. As used in this case, a put was an agreement that if the collection had not been liquidated by a specified date then the investor could by either extend the date or receive a refund

of their investment plus 10%. Ex. 79 at 2, 6. For the Simi collection this meant that if the collection was not liquidated by August 31, 2012, then on behalf of the AS Partners Salke could, by written notice to F&S prior to September 15, 2012, either receive a refund of their investments plus 10%, or extend the September 15 deadline. *Id.* at 6. The put was the same in the TW contract, except that liquidation had to happen by July 31, 2012, and the put had to be exercised by August 15, 2012. *Id.* at 2.

25. Because the TW and Simi contracts did not allow an individual investor to choose to exercise the put, Salke agreed to provide a separate put to the investors. Ex. 97.

26. In March 2012, Manley invested $100,000 split between the TW and Simi collections, while Feinstein invested $50,000 between them. Exs. 82–83. These were Feinstein's first investments with F&S, while Manley had previously invested $50,000 in one collection with F&S in November 2011. Ex. 61. Neuger did not invest in either the TW or Simi collections.

27. Manley and Feinstein experienced numerous delays and headaches in trying to communicate with Freeman and get paid back for their investments with the TW and Simi collections. *E.g.*, Exs. 94, 96, 99.

28. Manley and Feinstein were only sent their returns on the TW and Simi collections in September and October 2012, respectively. Ex. 21.[1]

**D. THE SUBJECT COLLECTIONS**

29. On October 31, 2012, Salke emailed investors about the possibility of investing in the Columbus collection. Ex. 101. The final purchase price of the Columbus collection was $1,750,000. Ex. 105 at 2. F&S projected that the Columbus collection would be liquidated by either February 20 or March 1, 2013. Ex. 34. Due to issues related to the distributions and delays in previous collections, Salke notified potential investors that there would be a new banking protocol regarding their contributions and distributions:

---

[1] While the parties did stipulate to the admissibility of virtually all exhibits, including Exhibit 21, it was unclear who actually created this exhibit and at trial the parties could not answer with sufficient certainty. Trial Tr. Day 3 Morning at 41. The Court relies on Exhibit 21 only to determine the dates and payments to Manley and Feinstein for their investments in the TW and Simi collections which are undisputed events. The Court otherwise gave this document no weight because it was an unknown document provided without an explanation or a source for its contents and portions were contradicted by testimony.

> In the future, a separate bank account will be maintained at Bank of
> America for the purpose of depositing contributions towards the
> investments and from which all distributions will be made. All proceeds
> from the sale of coins will be deposited into this special account. I, on
> behalf of investors, will monitor this account and I will see to it that all
> sales proceeds are distributed, pro-rata, to investors.

*Id.* at 2. This is a clear and express statement by Salke that he would monitor the sale of the collections and ensure the proceeds were appropriately distributed. In order to do that Salke would have to be aware of when coins were sold, how much they sold for, and how much each investor contributed to the collection.

30. Salke repeated these assurances in conversations with Manley. Salke told Manley that that he had nothing to worry about because of the new procedure because Salke would have full control over the coins and the segregated bank account, and coins would not be released until there was a payment. Trial Tr. Day 4 Morning at 55:17–25 (Manley).

31. Salke also informed potential investors of a change in the structure of each deal. The TW and SIMI deals had been based around a written contract between F&S and Salke as the agent of the investors, and separate contracts between Salke and each investor. However, going forward:

> [A]n option exists for [each investor] to deal directly with Freeman & Sear
> and not deal with Freeman & Sear through me as an intermediary. When I
> call you, you can let me know what way you prefer to deal in the future
> deals. Even if you deal directly with Freeman & Swear, you will still
> benefit from my involvement and oversight of the deals. It is also possible
> to deal through me and still have a contract between the investor and
> Freeman & Sear

Ex. 101 at 3. Here Salke is explaining that there are three possible contractual arrangements that the investors can have with F&S and confirms that, regardless of their choice, they will all receive the benefit of his involvement and oversight.

32. In this email Salke also informed investors that when F&S sells coins it will not transfer possession or title to the coins until the buyer has made its payment in full, "so neither Freeman & Sear nor our investment group has any undue exposure." *Id.* at 2.

33. For each collection from the Columbus collection onwards, each Plaintiff would have his own direct contract with "Freeman & Sear ("F&S") a general partnership" for each collection he invested in. Exs. 34–37.

34. Each of Plaintiff's contracts with F&S for the Columbus collection was largely identical, except that Neuger's contract had different dates for its put. For Manley and Feinstein, if the collection was not sold by March 31, 2013, then they had until April 15 to exercise their put by writing to F&S and either obtain a 110% refund or extend the exercise date. Ex. 34 at 1. However, Neuger's contract had to inform F&S if he was exercising his put by March 15, based on whether or not the collection was sold by March 30. *Id.* at 9. Neuger's contract for the Roman Chest collection, discussed below, also contained a similar timing problem, Ex. 37 at 1, while none of Manley or Feinstein's contracts had this issue. Ex. 35 at 1, 5; Ex. 36 at 1, 5. Neither party addressed why Neuger's puts contained different dates for the same collections, or how Neuger possibly could have exercised puts that were conditioned on future events that had not yet happened.

35. Salke emailed the Columbus collection solicitation to Manley and Feinstein. Exs. 101, 103, 105. However, there is no evidence in the record showing that Salke sent this solicitation to Hayes or Neuger.

36. On November 13, 2012, Manley invested $200,000[2] and Feinstein invested $300,000 in the Columbus collection. Ex. 34. On December 21, 2012, Neuger invested $125,000 in the Columbus collection. *Id.* at 9. Alan Salke did not invest in the Columbus collection, although Diane Salke invested $100,000. Ex. 42 at 12.

---

[2] Marshall Manley actually invested $150,000 in the Columbus collection, and his son Chasen Manley invested another $50,000. However, Chasen Manley later validly assigned all of his claims related to this litigation to his father orally and in writing. Trial Tr. Day 1 Afternoon at 111:25–112:7 (Manley). Chasen Manley was only passively involved in the investment even before he assigned his claims. For convenience the Court will treat Marshall Manley as if he had made the full $200,000 investment himself.

37. On November 24, 2012, Freeman emailed Salke, Manley, and Feinstein about a "one off" investment in 255 gold and silver coins that belonged to Alexander the Great and his father Phillip II. Ex. 108 at 2. Freeman indicated that the purchase price was $381,200, he expected a 37-40% profit, liquidation would take place over a five month period, and that would be willing to retain as little as 33% equity in the collection. Salke replied to all of them and indicated that he was very interested and that he would talk to Manley on Monday. *Id.* at 1. Two days later during the ensuing email discussion Feinstein asked if the "paperwork" would be the same as with the regular investments. Ex. 109 at 2. Specifically, Feinstein asked if the 10% put, the features of the segregated bank account, and communication would all be the same. *Id.* Freeman responded affirmatively, stating "[t]he deal is precisely as before in terms of the 10% put, segregated account, etc." *Id.* at 1.

38. On November 26, 2012, Manley and Feinstein signed separate contracts for the purchase of the 255 collection. Ex. 35. The total purchase price of the collection was $381,200, and Manley and Feinstein each invested $100,000. *Id.* at 1. On December 10, 2012, they each also invested $75,000 in the 347 collection, also sometimes known as the ABC collection. Exs. 23, 36; Trial Tr. Day 4 Morning at 62:4–5 (Manley).

39. The contracts for the 255 and 347 collections were functionally identical to the Columbus contracts, except for the dates of liquidation and the put. The 255 collection contract projected that the coins would be sold by April 26, 2013, the liquidation date for the put was April 26, 2013, and notice to F&S to exercise the put or extend the date had to be given by May 26, 2013. Ex. 35 at 1. The 347 collection contract projected that the collection would be sold by March 15, 2013, and if it was not sold by that date then they each had until April 15, 2013 to exercise their put. Ex. 36 at 1.

40. The final collection at issue is the Roman Chest collection. Neuger was the only Plaintiff to invest in the Roman Chest collection. He invested $75,000 on December 18, 2012. Ex. 37 at 1, 3.

41. To summarize Plaintiffs' investments: Manley invested $200,000 in the Columbus collection, $100,000 in the 255 collection, and $75,000 in the 347 collection for a total investment of $375,000; Feinstein invested $300,000 in the Columbus collection, $100,000 in the 255 collection, and $75,000 in the 347 collection for a total investment of $475,000; Neuger invested $125,000 in the Columbus collection, and $75,000 in the Roman Chest collection for a total investment of $200,000. Plaintiffs collectively invested $1,050,000 with F&S.

**E. THE S&L, MOU, AND ATTEMPTS TO RECOVER**

42. In late January 2013 Salke told Manley and Feinstein that they would see their returns on their investments "in very short order," and that he would know more by the end of the week. Ex. 117. In early February 2013, Salke sent Manley and Feinstein a solicitation for a collection called Sunrise which stated that over 97% of the Columbus collection had been sold, and that Freeman will start distributing the proceeds by the end of the next week. Ex. 118. Salke also informed Manley and Feinstein that the 347 collection had been sold at 70% yield and the proceeds would be distributed in mid-March. *Id.*

43. Salke did not establish a separate bank account at Bank of America for investor funds and distributions until late March 2013. Ex. 120. When Salke informed Manley about the account, Salke stated that he, Rob Freeman, and Tory Freeman were the authorized signers on the account, and that it would take two of their signatures to move funds. *Id.*

44. By April 1, 2013, Plaintiffs had not yet been paid for anything and had begun to complain to Salke. Exs. 122–24. Over the course of multiple emails sent that day, Salke reassured Manley and Feinstein and emphasized his past experience in investing in ancient coins when he was Berry Gordy's business manager, noting that "[t]o the best of my experience there was never a loss on these types of coins." Ex. 124. Salke told Manley and Feinstein that he had even discussed the possibility of putting his own assets on the in order to obtain a line of credit so that investors could get paid if the funds came in late. Exs. 122–24. Salke stated that:

> My reason for doing a loan guarantee is so my friends would feel a degree of comfort and stop bugging me about when they will get there [sic] money. One more point[,] which I told Marshall [Manley] some time ago. I have, in the past and might do again, stood ready to buy out any investor who is concerned about getting his funds but I will only pay what the investor invested so they would not need to wait for their money.

Ex. 124. That same day Salke also emailed Manley and Feinstein to explain that payment on the Columbus collection was late because the collection was not sold at auction and was instead sold directly to an Asian buyer Freeman had worked with before who offered a much higher price. Ex. 123.

45. Over the next few months Salke provided numerous explanations for why Plaintiffs had not yet been paid and repeatedly promised that it would happen soon. Exs. 127, 128, 129, 130.

46. On April 21, 2013, Salke said that most of the distributions would occur the following Wednesday. Ex 127. May 2 he emailed Manley and Feinstein to tell them that he had met with Freeman the day before to sign checks, and that Freeman would be mailing or wiring the money for the Columbus collection that day, and for the 347 collection either that day or the following day. Ex. 128. June 28 Salke informed Manley and Feinstein that on July 2 he and Freeman would be picking up a cashier's check from the buyer of the Columbus collection and they would receive their money on July 2 or 3, and they would receive the funds from the other collections by July 4. Ex. 130.

47. By the end of July, Plaintiffs had become convinced that Freeman had repeatedly lied to them. They started creating a plan for what steps Freeman could take that would allow them to recoup their investments without resorting to litigation. Ex. 258. A number of the proposed ideas required Salke's involvement, such as identifying F&S's assets, reviewing its records, and distributing proceeds from previous sales. *Id.* at 3. A few days later Feinstein emailed Salke to thank him "for the tremendous commitment of time,

energy, and money that you have put into watching over and defending the very significant financial interests and resources" of their investment. Ex. 259.

48. By August 2013 Plaintiffs and Freeman's other investors were done dealing with excuses and required Freeman to sign the S&L on August 21, 2013. Ex. 42. The S&L was an agreement between Robert Freeman d.b.a Freeman & Sear and the Co-purchasers of each Subject Collection, including Manley, Feinstein, Neuger (signed by his representative Hayes), Salke, as well as additional investors. *Id.*

49. The S&L created a payment system that required F&S to promptly distribute currently held proceeds, make an additional payment of $991,043 by September 6, 2013, and pay the full amounts owed by October 31, 2013. *Id.* at 6. Under the terms of the S&L the investors were entitled to receive a portion of all of F&S's sales until they were repaid, including proceeds from the sale of other assets owned by F&S that were not listed as collateral or related to the investors' coin purchases. *Id.* The S&L also gave the investors a first priority claim and perfected security interest in the collateral assets. *Id.* at 7.

50. The S&L listed the following items as collateral assets: 57 coins from the Columbus collection, 160 coins from the Roman Chest collection, 246 coins from the 347 collection, 175 coins from the 255 collection, a Sasanian Bowl, Vince Figure, Dacian Shield, Charles Edward III Medallion, and Monte Fiero Helmet. *Id.* at 14. The S&L also contained a list of how much each investor had invested in each collection. *Id.* at 12–13.

51. Unknown to Plaintiffs, on August 13, a week before Plaintiffs and Salke signed the S&L with Freeman, Salke secretly signed a separate, private, Sales and Liquidation Agreement ("Side S&L") with Freeman. Ex. 20. Salke's Side S&L listed him as having invested $855,469 in five collections: 255, 347, MT, Dijon, and AP. *Id.* at 4. The Side S&L required Freeman to pay Salke $427,500 before August 15, and another $427,500 before September 1. *Id.* at 5. It also provided Salke a liquidation preference of $1,140,480 which Freeman would also have to repay. *Id.* at 12. Manley only became aware of the possibility of the existence of a separate agreement between Salke and Freeman around November 2013. Ex. 291 at 575.

52. Plaintiffs' S&L was clearly the template for Salke's Side S&L, and the documents are incredibly similar. Trial Tr. Day 3 Afternoon at 98:7–19 (Hayes) (testifying that he created the initial drafts of the S&L). As a result, the Side S&L contained many provisions that conflicted with Plaintiffs' S&L. For example, both agreements require Freeman to distribute 100% of the proceeds from the sale of unrelated assets until each party received the amount it invested. *Compare* Ex. 20 at 6 *with* Ex. 42 at 5–6. However, if Salke receives 100% of the proceeds from those sales, then Plaintiffs and the other parties to the S&L cannot get any of those proceeds. Freeman also could not provide "a first priority claim and perfect security interest in an unencumbered asset pool" simultaneously to multiple parties. *Compare* Ex. 20 at 6 *with* Ex 42 at 7.

53. Freeman did not make any of the payments required by the S&L. Trial Tr. Day 3 Afternoon at 101:17–21 (Hayes). This led to further discussion among the investors, and Plaintiffs eventually agreed to give Freeman one more chance – the MOU. *Id.*

54. On October 23, 2013, Salke confirmed that the assets listed in the S&L were either in a safe deposit box at Bank of America or a storage facility. Ex. 147. He also informed Plaintiffs that while Rob and Tory Freeman were authorized to access the safe deposit box, he had the only key, and the storage facility could only be accessed with two signatures, one of which had to be his. Exs. 133, 147.

55. On October 28, 2013, Plaintiffs, Salke, and a few other investors from the S&L (defined as "purchase parties") signed the MOU with Freeman. Ex. 43. As part of the MOU Freeman transferred to them the remaining ownership shares of all of the assets listed in the S&L, as well as a "Multiple Torc Collar" and a "Spectacle Fibula." *Id.* at 3, 12. The MOU also listed the current location for each asset, which was either the safe deposit box or the storage facility. *Id.* at 12. The MOU also required Freeman to make certain cash payments according to a specific schedule. Ex. 43 at 2. The cash payments would be paid to the purchase parties according to the pro-rata amount each of them had invested in F&S. *Id.*

56. Salke emailed the attorney who prepared the MOU on November 7, 2013, to ask if the UCC lien that was filed related to the MOU included certain additional assets listed on an attachment he titled "Salke Collateral." Ex. 155. Salke's separate collateral consisted of 2 agate Neo-Babylonian cylinder seals, an unspecified lot of 30 Greek and Roman coins, 1 dolphin fibula, 44 unidentified ancient coins, and the Vince Figure. *Id.* at 2. These items are listed in Salke's attachment as having a value of $1,239,600. *Id.* Freeman testified that Salke had told him that it was "common knowledge" that the Vince Figurine was Salke's separate collateral. Trial Tr. Day 5 Morning at 19:3–19 (Freeman).

57. Salke became the sole signer for the storage facility on November 8, 2013, Exs. 157–58, and Rob and Tory Freeman's names were removed from the list of people authorized to access the safe deposit box some time before November 15, 2013. Ex. 160.

58. By mid-November 2013 Manley was convinced that Freeman could not be trusted at all given his extensive history of providing Plaintiffs with false information. Ex. 160. Plaintiffs and Salke then faced a dilemma on what to do with their collateral because Freeman selling them was their best chance at recovering their investments, but they did not trust Freeman because he had repeatedly lied about having found buyers. *Id.*; Ex. 161. Plaintiffs' discussion with Salke concluded on November 30th with an understanding that Freeman could still sell the coins if he had a buyer, but that Salke would not turn over any coins without first receiving payment in the separate account and distributing that payment to the investors. Ex. 164.

59. From September through December 2013 Salke made four visits to the safe deposit box. Ex. 45 at 3. The first visit was with Rob and Tory Freeman on September 13, the second visit was by himself on November 9, the third visit was with Rob Freeman on December 3, and the final visit was by himself on December 6. *Id.* Salke never informed Plaintiffs of any of these visits. Trial Tr. Day 4 Morning at 103:19–104:4 (Hayes). When the U.S. Marshal opened that safe deposit box and another one used by F&S in January 2016 there was nothing of value inside. Ex. 46.

60. Salke testified that during his last visit to the safe deposit box there were only around 50 coins in it, all from the Columbus collection. He then took these coins to his house and later gave them to one of the other investors who had also signed the S&L. Trial Tr. Day 5 Morning at 65:3–66:15 (Salke). The roughly 40 coins that were not fake or stolen were eventually auctioned by Heritage House for $22,749. Trial Tr. Day 3 Morning at 66:17–25 (Manley); Ex. 293 at 5. Plaintiffs would receive $11,138.58 of this total, with the remainder going to other investors in the Columbus collection. *Id.*

61. On December 11, 2013, Freeman emailed Salke an amendment to their Side S&L. Ex. 29. Freeman agreed that F&S would sell the collateral held by Salke in its January 2014 auction and pay Diane Salke $125,000 on or before December 18, 2013. *Id.*

62. Plaintiffs filed the *Freeman Action* against Robert Freeman, Tory Freeman, and F&S on December 19, 2013. Ex. 55. They brought claims for breach of contract, conversion, and account stated, and received a default judgment on the first two claims for $1,303,353.86 including attorneys' fees, plus pre and postjudgment interest. *Id.* at 9.

63. In January 2014 Freeman emailed Salke to discuss the difficulties he was having in attempting to secure funding so that F&S could operating long enough to sell his remaining assets. Ex. 169. He explained that a portion of a potential loan would have been "distributed to Diane [Salke] and other investors." In addition, Freeman reminded Salke that "you have thus far received 264k in funds not necessarily generated by the sale of your partnered material but rather from disparate sources in an attempt to make you whole. The other investors have received almost nothing and F&S has taken virtually nothing at all as should be obvious." *Id.*

64. In April and May 2014 Freeman wrote himself checks for $171,000 and $32,750 from the F&S bank account that Salke was supposed to be monitoring, likely by using older checks that only required one signature. Ex. 52 at 126–27; Ex. 162 at 2; Trial Tr. Day 5 Morning at 23:2–25:14 (Freeman). This occurred after Freeman had a default entered against him in the *Freeman Action*, but before Plaintiffs had obtained the default judgment. Ex. 55.

## II.  CONCLUSIONS OF LAW

### A.  JURISDICTION

65.  Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. Plaintiffs are citizens of Minnesota, Florida, and Pennsylvania. Defendant is a citizen of California. There is therefore complete diversity of citizenship between the parties. The amount in controversy is $1,050,000. First Amended Complaint at 15. This Court therefore properly has diversity jurisdiction over the case. *See* Docket No. 148 (finding that Chasen Manley's assignments to his father were not collusive and did not violate 28 U.S.C. § 1359).

66.  Because of the interconnected nature of the issue, the Court will address Salke's purported partnerships before turning to Plaintiffs' claims, and then Salke's affirmative defenses.

### B.  SALKE'S PURPORTED PARTNERSHIPS WITH FREEMAN OR PLAINTIFFS

67.  "The association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Cal. Corp. Code § 16202. "A partnership is an entity distinct from its partners." *Id.* § 16201. As the parties asserting that a partnership existed, plaintiffs bear the burden of proving its existence. *Mercado v. Hoefler*, 190 Cal. App. 2d 12, 16 (1961).

68.  Plaintiffs argued that Salke was in two legally separate partnerships during the time in question: one with all three Plaintiffs, and one with Freeman. Pls.' FOF ¶¶ 119, 125.

69.  Plaintiffs did not argue that there was an overarching common law partnership that included Salke, Freeman, and themselves.

70.  Plaintiffs also did not argue that Salke was a partner in F&S. During trial individual Plaintiffs testified that Salke was a partner in F&S. *E.g.*, Trial Tr. Day 1 Morning at 74:11–15 (Manley) ("That paragraph does not say Alan Salke except for the fact that he was also part of Freeman & Sear"). However, nowhere in their proposed findings did Plaintiffs ask the Court to find that Salke was a partner in F&S. To the contrary,

Plaintiffs asked the Court to find that Salke misrepresented that he was a partner in F&S, and that those misrepresentations form a part of their fraud claim. Pls.' FOF ¶¶ 16, 98. Plaintiffs have therefore abandoned any argument that Salke was a partner in F&S. Even if Plaintiffs had not abandoned this argument, the Court could not find that Salke was a partner in F&S. Salke began doing business with F&S in 2010, and there is no evidence that he owned any portion of F&S or was entitled to any of its profits aside from those deriving from his own investments. Plaintiffs have not even shown that there was even one other partner in F&S besides Robert Freeman prior to 2010, and California law does not permit a partnership of one to exist. Cal. Corp. Code § 16202 (defining a partnership as "[t]he association of two or more persons . . . ."). The Court therefore harbors substantial doubts that F&S was even a partnership during the relevant time period. *See* Ex. 42 at 3; Trial Tr. Day 4 Afternoon II at 9:20–24 (Freeman) (stating that F&S ceased being a general partnership after 1997).

71. Salke often used the word "our" or "partner," but not in a legal sense. *E.g.*, Ex. 85 ("I though[t] you just might be interested in being a partner in this very interesting collection."); Ex. 113 (referring to those investing with F&S as "our investors"); Ex. 64 (Salke informing Freeman that "I have been paying some of the investors and I have not asked for your help. I did this because that is what a partner should do. A partner should plan for the future of the partnership."); Ex. 121 (Salke privately emailing Freeman and asking for better communication because they are partners). However, mere use of the word partner is not sufficient to find that a partnership existed. *Hammond v. Borgwardt*, 126 Cal. 611, 612–13 (1899).

72. Like all F&S investors, Salke was entitled to a share of the profits made on the sale of an individual collection he invested in, based on his percentage of the total investment. Trial Tr. Day 4 Afternoon II at 53:9–18 (Freeman). Salke was also entitled to either 2.5% or 5% of the total investments he brought in as a finder's fee. *Id.* at 53:16–54:1 (Freeman). However, no evidence suggested that Salke owned any portion of any entity

with Freeman, or with Plaintiffs. Similarly, no evidence suggested that Salke was entitled to share in anyone's losses or profits beyond the scope of his own investments.

73. Salke did not provide meaningful expertise on antique coins. He could not identify coins that were being sold at below market rates, nor did he have the experience or connections to sell them at retail rates. Salke's role was to get funds from his friends and family and shepherd their investments. Trial Tr. Day 4 Afternoon II at 39:14 – 40:20 (Freeman). He was compensated for this with a finder's fee for the assets he brought in, but not equity or any portion of profits.

74. By the time of the Columbus collection, F&S had begun doing deals directly with the investors. *Id.* at 40:22–41:6, 48:1–15 (Freeman). At that point Salke no longer had any sort of essential management role in F&S, if he ever had one. His primary duties were to liaise between Freeman and the investors, monitor F&S's segregated bank account, and ensure that investors received their distributions. These duties are all related to oversight and do not suggest that Salke was involved in true management or control of the purported partnership(s).

75. While these duties were important, they are not enough for Plaintiffs to meet their burden in showing that Salke was in a partnership.

### C. FRAUD

76. Plaintiffs' fraud claim is that Salke "fraudulently induced Plaintiffs to invest over $1 million with Salke, his partner, Robert Freeman, and their purported partnership, Freeman & Sear, for the purchase and sale of certain ancient coin collections." PTCO at 3. Plaintiffs argued that Salke made intentional misrepresentations. *Id.* Plaintiffs did not argue that Defendant's conduct constituted fraud under any other theory, such as, for example, constructive fraud under Civil Code § 1573.

77. The elements of fraud are: (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

78. Plaintiffs presented a laundry list of representations made by Salke that they now believe were fraudulent. Pls.' FOF ¶ 98. The Court will only address two of them in detail: Salke's representations that he was a partner with F&S, and his representations regarding his and his family's investments with F&S. The Court will address the remaining representations below in a more summary fashion.

79. Plaintiffs argued that they relied on representations made by Salke about Freeman's qualifications, and the involvement of Sear in Freeman & Sear. Plaintiffs did not prove that they relied on either set of representations. In deciding to invest in the Subject Collections, Plaintiffs relied on their own prior experiences of investing with F&S, not isolated statements from six months to a year or more prior. If Plaintiffs had relied on these representations the Court would have expected at least some mention of these representations in their extensive correspondence with Salke and Freeman. Plaintiffs did on occasion inquire about the terms of upcoming deals, but Plaintiffs did not identify any occasion where they asked about Freeman's qualifications or even inquired about the existence of Sear. Plaintiffs also failed to prove that Salke's representations regarding Freeman's qualifications were false, or that Salke knew they were false.

80. Plaintiffs also argued that Salke represented that he would personally honor a put and subordinate his claims. However, for reasons that will be discussed below, Salke never agreed to provide a put or subordinate his claims for the Subject Collections.

81. Plaintiffs argued that Salke intentionally misrepresented that he would provide oversight of F&S for the Subject Collections. Ex. 101. However, Plaintiffs have provided no evidence to infer that Salke made those statements knowing they were false. Plaintiffs' evidence only shows that he failed to perform his oversight obligations. Evidence of nonperformance alone is insufficient to show fraudulent intent. *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 31 (1985) ("if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury."). The fact that Salke made some attempts at providing oversight in the investments actually shows both that the statements were true, and that he lacked fraudulent intent.

## 1.    SALKE'S PARTNERSHIP WITH F&S

82.  Plaintiffs argued that Salke misrepresented that he was a partner in F&S. Pls.' FOF ¶ 98.

83.  Plaintiffs did not identify a clear representation by Salke that he was a partner in F&S in a legal sense. Salke telling Plaintiffs that he or Freeman will honor the put on the TW and Simi collections is not a representation that Salke is a partner in F&S. Ex. 97. As explained above, Salke also had a habit of using the word partner colloquially, but that is not enough. *E.g.*, Ex. 85 at 2.

84.  Plaintiffs cited to private statements Salke made to Freeman to show that Salke misrepresented that he was a partner in F&S, but Plaintiffs could not have relied on statements that Salke made privately to Freeman because Plaintiffs were not aware of them until they received them in discovery in this litigation. Ex. 64 (private email from Salke to Freeman).

85.  In deciding to invest in the Subject Collections, Plaintiffs could not have reasonably relied on any representations made by Salke regarding his status as a partner in F&S that were made before Manley and Feinstein invested in the TW and Simi collections in March 2012. Exs. 81–83. The parties to the TW and Simi contracts were "[F&S], a general partnership and Alan Salke ('AS'), in his capacity as agent for multiple investors ('the AS Partners')[.]" Ex. 79 at 2, 6. If Salke was a partner in F&S, then making him an agent for the investors, and then having Salke create separate oral contracts with each investor strikes the Court as a particularly convoluted and unnecessary way to structure these deals. If Salke were a partner in F&S, this structure would likely only increase Salke, Freeman, and F&S's potential liability. It would have been far simpler to just have Salke make the same oral contracts and do away with the contract between Salke and F&S, or turn that into a prospectus. In addition, if Salke had been a partner in F&S then a number of the contract provisions like the security interest, indemnity provisions, and Salke's contribution to Freeman's life insurance premiums would all be unnecessary, redundant, or counterproductive. *Id.* The only reasonable conclusion from reading the TW and Simi contracts is that Salke was not a partner in F&S. Manley and

Feinstein would have both read these contracts diligently because Manley had only invested in one prior collection, and Feinstein had never invested with F&S before.

86. Plaintiffs did not have a reasonable basis for believing that Salke was a partner in F&S from October through December 2012. In Salke's solicitation for the Columbus collection, as discussed above, he presented investors with three potential structures for their contractual relationship with F&S: (1) having a contract with Salke, presumably similar to what was done for the TW and Simi collections; (2) having a contract directly with F&S without Salke as an intermediary; and (3) dealing directly with Salke, but still having a contract with F&S. Ex. 101 at 3. Plaintiffs could not have believed that Salke was a partner in F&S as a general partnership because that would mean that all of these options were identical.

87. Plaintiffs could not have relied on any statements made after December 2012, because they had already invested in the Subject Collections. *E.g.*, Ex. 121 (private email from Salke to Freeman sent March 2013).

88. Plaintiffs have not identified any representation made by Salke that they reasonably could have relied on to conclude that he was a partner in F&S when they invested in the Subject Collections.

## 2. SALKE AND HIS FAMILY'S INVESTMENTS WITH F&S

89. Plaintiffs argued that Salke intentionally misrepresented the amount that he and his family had invested in F&S. Pls.' FOF ¶¶ 27, 98.

90. Plaintiffs could only have relied on misrepresentations made to them before they had fully invested in the Subject Collections by December 2012. *E.g.*, Ex. 116 (purported misrepresentation by Salke that he and his family had invested $1.5 million in January 2013; Ex. 117 at2 (Salke informing Manley in January 2013 that he wanted to invest between $1 and $1.3 million in the Sunrise collection).

91. Plaintiffs have identified two representations made by Salke before December 2012 regarding his family's investment in antique coins, Exhibits 96 and 104.

92. Exhibit 96 is an email from Salke to Manley on August 31, 2012, where Salke told Manley that the wire for a previous collection was sent and that he needs to stop worrying. Salke wrote "I will back you up 100% . . . I have over $1 million with him and I have checked him out 100% . . . as you have." This email does speak to Salke's investments with Freeman, but not his family's. However, Plaintiffs have not proven that this statement by Salke was false, or that Salke knew it was false. The evidence from Salke's Side S&L shows that Salke still had $855,469 invested and outstanding with F&S as of August 2013. Ex. 20 at 4. Given that other collections had paid out in that intervening year, it seems quite possible that Salke's statement was true, and Plaintiffs have not provided evidence of how much Salke had with F&S at the time he made this statement.

93. Exhibit 104 is an email in which Salke informed Manley that they were closed to new investors and provided a list of "our investors," which included Bert, Diane, Allegra, and Alan Salke, as well as Manley, Feinstein, and Hayes. Ex. 104 at 2. Manley and Feinstein both testified that they understood that Salke's family would be investing in the Columbus collection if not also other future collections, and that this impacted their decisions to invest with F&S. Trial Tr. Day 1 Afternoon at 31:4–9 (Manley), Day 3 Afternoon at 57:15–58:19 (Feinstein). However, all this email did was inform Manley that, while F&S was not generally open to new investors, Salke's family members could still invest if they wanted to do so. It is not a representation by Salke that his family will be investing in the Columbus collection or any other collection.

94. For the foregoing reasons Plaintiffs' claim for fraud fails.

### D. BREACH OF FIDUCIARY DUTY

95. Under California law a fiduciary relationship is:

> any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the

party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent.

*Herbert v. Lankershim*, 9 Cal.2d 409, 483 (1937) (quotation omitted). When a fiduciary relationship is not imposed by law, then it must be knowingly accepted. *City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008).

96. Plaintiffs argued that, regardless of any partnership Defendant might have been in, he created a fiduciary relationship with Plaintiffs because of the repeated statements he made that he would be involved with and oversee their investments. PTCO at 6–7. Defendant argued that he was not their fiduciary because he lacked exclusive control over the funds or coins. Trial Tr. Day 5 Afternoon at 58–60 (Defendant's Closing Argument).

97. A fiduciary relationship imposes a number of duties on the fiduciary, including a duty "to act with the utmost good faith for the benefit of the other party," *Bacon v. Soule*, 19 Cal. App. 428, 434 (1912), and a duty of loyalty that prohibits the fiduciary from taking advantage of the other party in any way connected to their relationship without her knowledge and consent. *Herbert v. Lankershim*, 9 Cal.2d at 483.

98. "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820 (2011).

    **1.    SALKE OWED PLAINTIFFS FIDUCIARY DUTIES**

        **a.    SALKE'S ACTIONS IN ESTABLISHING THE FIDUCIARY RELATIONSHIP**

99. On February 19, 2012, less than a month before Manley invested in the TW and Simi collections, Salke emailed him about investing in antique coins and told him that "[t]he three most important people are Bert [Salke's son] you and me." Ex. 73.

-24-

100. Salke clearly owed Manley and Feinstein a fiduciary duty for their investments in the TW and Simi collections by operation of law because he expressly agreed to act as the agent for the investors for those collections. Ex. 79 at 2, 6. This fiduciary relationship with regards to Manley and Feinstein continued at least until they received their payments for the Simi collection on October 23, 2012. Ex. 21.

101. Freeman testified that Salke's role in the operation as "marshalling" and "shepherding" funds. Trial Tr. Day 4 Afternoon II at 39:14–40:20 (Freeman). Freeman was not generally aware of what representations he may have separately made to investors, but it was clear that part of his job was to liaise with Freeman, raise funds, and provide support for the investors. *Id.*

102. In Salke's emails to Manley and Feinstein about the Columbus collection in October and November 2012, he informed them that investors' contributions and all proceeds from the sale of the coins would be deposited in a separate account. Ex. 101 at 2. Salke also informed them that "I, on behalf of investors, will monitor this account and I will see to it that all sales proceeds are distributed, pro-rata, to investors." *Id.* Manley and Feinstein were expressly assured that the 255 collection would have all of the same terms as the Columbus collection, including the segregated bank account. Ex. 109.

103. In the Columbus email Salke informed Manley and Feinstein about three possible contractual arrangements investors could choose. Ex. 101 at 3. Salke told them that "[e]ven if you deal directly with Freeman & Sear, you will still benefit from my involvement and oversight of the deals." *Id.* This statement is particularly insightful because Salke did not invest in the Columbus collection. Ex. 42 at 12. Salke's promise to be involved and provide oversight was thus not motivated by direct financial incentive in the profit on the Columbus collection. Salke's use of the plural "deals" shows that he intended his promise to cover multiple collections.

104. Salke therefore promised Manley and Feinstein that he would: be involved with the deals, provide oversight, monitor the segregated account, and ensure that the proceeds from the sales of the coins were properly distributed.

105. Also relevant to the existence of a fiduciary duty is the fact that Salke, unlike Plaintiffs, lived in Los Angeles. This disparity in access meant that he alone was capable of actually providing physical oversight over the physical antiques and coins involved at bank, safe deposit box, and storage facility. It also allowed him to interact with Freeman on a regular basis. Plaintiffs had to largely rely on Salke's representations regarding the status of the deals, F&S's current financial situation, even the existence of the coins. This was particularly important when Plaintiffs lost faith in Freeman and Salke began to act more like their agent on the ground to figure out how they could recover their investments.

106. Based on these promises, his prior fiduciary relationship for the TW and Simi collections, residence in Los Angeles, close personal relationship with Manley and Freeman, clear role in the financial side of putting the deals together, the absence of a contractual relationship with Plaintiffs (discussed more below), and lack of similar financial incentive, Salke knowingly undertook to act for benefit of Manley and Feinstein and thereby created a fiduciary duty.

107. This fiduciary duty necessarily encompassed the Columbus collection because that was the collection Salke was soliciting for when he made a number of these promises. It also included the 255 collection, which had the same terms as the Columbus collection, including the segregated bank account. Ex. 109. Manley and Feinstein invested in the Columbus collection on November 13, 2012, and in the 255 collection on November 26, 2012. They invested in the 347 collection only two weeks later on December 10, 2012. The close temporal proximity of the 347 investment, along with the ongoing nature of Salke's commitment and his own statement that these obligations would exist for multiple "deals" leads the Court to conclude that Salke's fiduciary duties to Manley and Feinstein also encompassed the 347 collection.

108. However, Salke did not have a fiduciary relationship with Neuger. Neuger did not invest in the TW, Simi or any prior collection. There is no evidence in the record that Neuger or his agent Hayes received the solicitation for the Columbus collection quoted above. In

addition, there are very few communications in the latter half of 2012 or first half of 2013 between Salke and Neuger or Hayes. Salke also had no personal connection to Neuger and did not introduce either of them to Freeman. Plaintiffs have therefore failed to prove that a fiduciary relationship existed between Neuger and Hayes.

### b. SALKE'S SUBSEQUENT ACTIONS

109. The existence of Salke's fiduciary obligations to Manley and Feinstein are further shown by Salke's actions after Manley and Feinstein invested in the Columbus, 255, and 347 collections.

110. Salke continued to liaise with Freeman on behalf of the investors up until they filed the *Freeman Action*. *E.g.*, Exs. 113, 127–130, 156, 164. This included repeatedly relaying (almost always incorrect) information from Freeman to the investors about who Freeman was selling the collections to and when they would get paid back. *E.g.*, Ex. 123. Salke described himself as a "complete pain in the ass" to Freeman because he was bugging him three to four times a day. Ex. 129. Salke testified that these inquiries were made on behalf of his friends and family, including Manley and Feinstein. Trial Tr. Day 5 Morning at 54:9–15 (Salke).

111. Salke repeatedly reassured Manley and Feinstein that there was nothing to worry about. He cited his own experience investing in antique coins as Berry Gordy's manager. Ex. 124. He also told Manley and Feinstein that he had bought out investors in the past and may do so again, and that he was not concerned about any potential loss from buying out an investor because he would still have the coins as collateral. *Id.* Salke was so confident in Manley and Feinstein realizing a return on their investments that he discussed the idea of getting a line of credit against his own assets so that the investors could get paid. Ex. 122.

112. Salke also made some attempts to follow through on his promises regarding the segregated bank account. In March 2013 he became an authorized signer on the segregated bank account. Ex. 120. He also gained access to the safe deposit box and storage facility where coins were stored, and by October 2013 coins could not be

removed from either without his permission. Exs. 133–34, 147. Freeman testified that Salke wanted to be a signer on the segregated bank account for transparency and so that he could show the investors that he was working for them. Trial Tr. Day 4 Afternoon II at 55:2–16 (Freeman). This is particularly telling because Salke has no apparent financial incentive to get more involved at this point.

113. These actions show that Salke continued to act for the benefit of Manley and Feinstein even after they invested when Salke has nothing to gain by acting for their benefit, and further prove that he owed them fiduciary duties.

## 2. SALKE BREACHED HIS FIDUCIARY DUTY

114. Plaintiffs argued that Salke breached his fiduciary duties to them because he "failed to personally oversee, safeguard and/or supervise Plaintiffs' investments or otherwise protect Plaintiffs' investments," and "willfully and knowingly placing his interests above Plaintiffs' and taking affirmative steps to gain advantages over Plaintiffs." Pls.' FOF ¶¶ 59, 63. Defendant argued Plaintiffs were not harmed by any breach of Salke's fiduciary duties because Freeman's actions were an intervening force that caused Plaintiffs' losses. Trial Tr. Day 5 Afternoon at 60–61 (Defendant's Closing Argument).

115. Salke clearly breached his fiduciary duties by failing to provide any sort of meaningful financial oversight or monitoring the segregated account. Although the segregated account was supposed to receive the investors' contributions for the Subject Collections in November 2012, it was not actually opened until March 2013. Ex. 120. After it was established, Salke admitted that he did not monitor it or review its activity. Trial Tr. Day 5 Morning at 58:15–59:11 (Salke). He also did not review bank statements, review checks, or do anything else which could be described as oversight. *Id.*; *see also* Trial Tr. Day 5 Morning at 21:10–22:7 (Freeman).

116. In April and May 2014, after Plaintiffs had filed the *Freeman Action* and obtained an entry of default, but before they received their default judgment, Freeman used two older checks that did not require Salke's signature to withdraw a total of $203,750 from the

segregated account. Ex. 52 at 126—27; Trial Tr. Day 5 Morning at 23:2–25:14 (Freeman).

117. Salke breached his duty of loyalty to Manley in Feinstein by putting his and his wife's interests above Manley and Feinstein. The Side S&L was clearly an attempt by Salke to secure his own debts over those of Manley and Feinstein. If Salke had actually thought that the Side S&L was above-board he would have mentioned it at some point in the countless discussions with Plaintiffs regarding the S&L, MOU, and their attempts to recover their investments.

118. Salke got the Vince Figurine because Salke told Freeman that it was common knowledge among the investors that the Vince Figurine was part of Salke's separate collateral, even though it was actually promised to Plaintiffs in the S&L and MOU. Trial Tr. Day 5 Morning at 17:14–19, 19:8–23 (Freeman). However, because The Vince Figurine was owned by the purchase parties pursuant the MOU, the Court will address it below in the conversion claim. To allow Plaintiffs to recover the value of the Vince Figurine on theories of both fiduciary breach and conversion would necessarily amount to double recovery.

119. Salke got Freeman to separately agree to pay Diane Salke $125,000 in December 2013. Ex. 29. However, Plaintiffs did not provide any evidence that Diane Salke ever actually received the $125,000, or any amount of money from Freeman.

120. By January 2014 Freeman had paid Salke $264,000, even though, in Freeman's own words, "[t]he other investors had received almost nothing." Ex. 169.

121. As will be described below, Plaintiffs made no attempt to identify specific damages for each claim. Thus, Plaintiffs have not shown what their damages were, if any, from Salke's failure to be involved in the deals, provide meaningful oversight, and keep track of the funds in the segregated account. It is certainly possible such actions could have exposed Freeman's fraud earlier and reduced Plaintiffs' losses, or prevented Freeman from using an older check to take money from the segregated account. However, there is no evidence regarding these possibilities in the record and Plaintiffs cannot prevail at

1    trial based only on speculation. There is also no evidence that Plaintiffs suffered any

2    harm from the Side S&L because there is no evidence that Freeman ever provided Salke

3    with any benefits pursuant to it.

4    122.   However, Plaintiffs did provide evidence that showed Salke received $264,000 from

5    Freeman while Manley and Feinstein received nothing from him. This is a clear breach

6    of Salke's duty of loyalty because he put his own interests above Plaintiffs' interests.

7    Because Salke's receipt of the money constituted a breach of his fiduciary duty, the

8    Court believes the appropriate remedy is to compensate Manley and Feinstein as if

9    Freeman had made that payment to the purchase parties according to the MOU. The

10   parties to the MOU collectively invested $1,622,500 with F&S, while Manley invested

11   $375,000, and Feinstein invested $475,000. Ex. 43 at 11. If Freeman had paid the parties

12   to the MOU as a whole as he was obligated to instead of just paying Salke, Manley

13   would have received $61,016, and Feinstein would have received $77,288.

14   123.   Insofar as it is unclear whether Plaintiffs would or could be entitled to prejudgment

15   interest on their breach of fiduciary duty claim, the Court finds that prejudgment interest

16   is not warranted or appropriate on this record. Plaintiffs did not address this issue or

17   provide any authority on the topic. The Court also believes that it is likely that Freeman

18   only paid Salke because of their personal relationship, and that Freeman would very

19   likely have not have even paid that had he known that Manley and Feinstein would later

20   recover some portion of the payment. This recovery for Manley and Feinstein thus

21   represents a relative windfall given their own difficulties in collecting against Freeman.

22   To the degree this breach can be seen as money constructively coming from Freeman

23   through Salke to Manley and Feinstein, requiring Salke to pay prejudgment interest on

24   that payment does nothing help make Manley and Feinstein whole with regards to the

25   losses caused by Freeman.

26       **E. BREACH OF CONTRACT**

27   124.   "A cause of action for breach of contract requires proof of the following elements: (1)

28   existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3)

-30-

defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008), *as modified on denial of reh'g* (Feb. 5, 2008).

125. Plaintiffs argued that they had an overarching, partly oral and partly written contract with Salke that applied to all of their investments with F&S and was not tied to specific collections. Pls.' FOF ¶ 108. This purported contract required Salke to subordinate his claims in the Subject Collections, honor the put himself if F&S failed to do so, personally guarantee that F&S would perform its obligations, pay personally if F&S failed to do so, and provide oversight related to the collections and distributions. *Id.* ¶ 110. Plaintiffs did not argue that Salke owed them contractual duties under the S&L or MOU.

126. As explained above, the TW and Simi collections were structured as one written contract between F&S and Salke, and separate informal contracts between Salke and each investor. Salke was thus the contractual intermediary between F&S and the investors. However, for the Columbus collection onwards Salke presented the investors with three choices for how they wanted to structure their contracts. Ex. 101 at 3. They could either: (1) deal directly with F&S and not have Salke as an intermediary, (2) have a direct contract with F&S but still use Salke as an intermediary, or (3) continue the previous arrangement and not exercise the option to have a direct contract with F&S. *Id.* Plaintiffs each chose to have a direct contract with F&S. Because of this change in the structure of the deals, any evidence that might show a contractual relationship prior to the discussions of Columbus collection has little weight in showing the existence of a contract that covered the Subject Collections.

127. The fact that each Plaintiff could have had a contract with Salke for the Subject Collections and instead chose to have a contract directly with F&S is compelling evidence that there was no overarching contractual relationship that existed separate from the specific investments and their written contracts.

128.  In addition, it is implausible that such a contract existed because it would contain terms that are starkly different than the terms found in Plaintiffs' written contracts with F&S. For example, each put in Plaintiffs' contracts with F&S included specific dates by which Plaintiffs had to either exercise it or extend it, yet Salke purportedly orally agreed to honor a 110% put indefinitely. This would virtually guarantee that if the put needed to be exercised he would be the one to pay it. Similarly, Salke purportedly agreed to subordinate his claims to the Columbus collection, yet he never invested in that collection. He also agreed to personally guarantee F&S's obligations for the Roman Chest collection, but it's unclear that he was even aware of the existence of that collection until many months after the contracts were signed.

129.  Plaintiffs also failed to identify the relevant terms of this contract in a coherent fashion. They cited to emails stretching across multiple years, none of which gave the impression that there was a contractual relationship for the Subject Collections. *E.g.*, Pls.' FOF ¶¶ 53–55 (citing dozens of exhibits).

130.  If Plaintiffs had a contract with Salke that existed separate and apart from their contracts with F&S, it is very surprising that it is never discussed in all of their correspondence in 2013. One would certainly have expected at least one Plaintiff to have at least mentioned the existence of this contract, particularly when Plaintiffs start discussing how to get their money from Freeman, the terms of the S&L and MOU, and whether or not to file a lawsuit against him.

131.  For these reasons there was no contract between Plaintiffs and Salke for the Subject Collections.

132.  Defendant's arguments related to the statute of frauds, statute of limitations, and the integrations clauses in the SOL and MOU are therefore moot.

### F.  CONVERSION

133.  "To establish conversion, a plaintiff must show (1) his ownership of or right to possess the property at the time of the conversion, (2) that the defendant disposed of the plaintiff's property rights or converted the property by a wrongful act, and (3) damages."

*Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008) (citing *Messerall v. Fulwider*, 199 Cal.App.3d 1324 (1988)). While there are multiple ways to measure damages for conversion, the appropriate measure of damages for conversion in this case would be "the value of the property at the time of the conversion, with the interest from that time." Cal. Civ. Code § 3336. However, "[w]here damages for loss of use exceeds the legal rate of interest, it is appropriate to award the former, but not both. *Lint v. Chisholm*, 121 Cal. App. 3d 615, 625 (Ct. App. 1981).

134. Plaintiffs argued that Salke converted the assets that were transferred to Plaintiffs and Salke under the MOU.

135. As of October 23, 2013, the following items that were in either the storage locker or safe deposit box were designated as collateral assets in the MOU: 57 coins from the Columbus collection, 160 coins from the Roman Chest collection, 246 coins from the 347 collection, 175 coins from the 255 collection, a Sasanian Bowl, Vince Figure, Dacian Shield, Charles Edward III Medallion, and Monte Fiero Helmet. Ex. 147. When the parties signed the MOU the following week, they also included the Multiple Torc Collar and Spectacle Fibula on their list of collateral assets located in the storage locker. Ex. 43 at 12. Based in part on the values from the S&L, Salke calculated that these collateral assets were worth $3,429,992. Ex. 153 at 2.

136. Those assets could only be removed from their respective location by Salke. Exs. 133, 147.

137. Freeman transferred his ownership share and title of these assets to Plaintiffs and Salke in the MOU on October 28, 2013. Ex. 42 at 3. This meant that the purchase parties owned these assets in their entirety.

138. On November 30, 2013, Salke promised to comply with Manley's request to not turn over any assets to Freeman until he had received payment and the proceeds had been distributed to Plaintiffs. Ex. 164.

139. From September through December 2013 Salke made four visits to the safe deposit box. Ex. 45 at 3. The first visit was with Rob and Tory Freeman on September 13, the second

visit was by himself on November 9, the third visit was with Rob Freeman on December 3, and the final visit was by himself on December 6. *Id.* Salke never informed Plaintiffs of any of these visits. In early January 2016, the U.S. Marshals's Service searched two safe deposit boxes used by F&S, including the one monitored by Salke, and found no coins or assets of value in either box. Ex. 46.

140.    Salke eventually turned over roughly 50 coins from the Columbus collection that were sold at auction. Trial Tr. Day 3 Morning at 66:2–67:16 (Manley); Ex. 44 at 1–2. While the parties, presumably relying on Freeman's estimates, had valued these coins at $1,630,500, some were fake, one appeared to be stolen, and none were as valuable as they had hoped. Trial Tr. Day 3 Morning at 66:17–25 (Manley). Around 40 coins were eventually sold at auction by Heritage House for $22,749. Ex. 293 at 5. Salke did not convert these coins because he gave them to Plaintiffs. However, because these coins were all from the Columbus collection and Salke did not invest in the Columbus collection, Salke is not entitled to an additional offset that he would be allowed if he had owned a share of those coins and been deprived of it. The fact that the coins were far less valuable than Freeman had led them to believe is unfortunate, but it is ultimately not a loss that Plaintiffs have attempted to attribute to Salke.

141.    Plaintiffs' attorney is also in possession of the Sasanian Bowl, Dacian Shield, Monte Fiero Helmet, Multiple Torc Collar, and Spectacle Fibula. Ex. 293. There is no evidence in the record that these assets have been sold. Therefore, while Salke does own a share of these assets through the MOU, he is not entitled to an offset or credit for them because no sale has been made. The Court has no way of valuing these antiques on this record, but even if the parties' valuation was realistic, it may be difficult for them to see a return on the Dacian Shield for example, because it may have been looted from Romania and many reputable auction houses would be unwilling to auction such goods out of concern that the Romanian government may attempt to regain the items. Ex. 293 at 14.

142. The remaining unaccounted collateral assets from the MOU are the 160 coins from the Roman Chest collection, 246 coins from the 347 collection, 175 coins from the 255 collection, the Vince Figure, and the Charles Edward III Medallion. The total value of these assets according to the parties' understanding of their value was $1,056,992. Ex. 147.

143. Plaintiffs have shown by virtue of the MOU and their investments that they had a right to these collateral assets. Salke was holding them on behalf of all of the parties who signed the MOU, and they were under his exclusive control. The fact that they are now unaccounted for is sufficient to convince the Court that Salke converted these collateral assets.

144. The only task left is to determine Plaintiffs' damages from Salke's conversion separate and apart from the damages sustained by the other investors (including Salke and his wife) who are not plaintiffs in this litigation. This requires determining when the collateral assets were converted, and what their value was at that time. The conversion occurred at the latest by Salke's last visit to the safe deposit box on December 6, 2013. The parties agreed on the value of the collateral assets in the S&L and when they prepared the MOU, and it is particularly appropriate to use those values because in this litigation both sides asked the Court to use those values for various purposes. Ex. 42 at 14; Ex. 147; Pls.' FOF ¶ 68; Def.'s FOF at 37.

145. The converted collateral assets had a total value of $1,056,992. Ex. 42 at 14. Plaintiffs collectively invested $1,050,000 of the total capital $1,622,500 invested by the purchase parties of the MOU. Ex. 43 at 11. This means that Plaintiffs owned 64.71% of the collateral assets, and that Salke is liable to them for converting $684,031 of their collateral assets. Breaking that down by Plaintiff, Manley is entitled to $244,297 for his conversion claim, Feinstein is entitled to $309,442, and Neuger is entitled to $130,291.

146. In light of Plaintiffs' dramatically low return on the Columbus coins that were sold at auction, and Plaintiffs' difficulty of selling some of the antiques, Plaintiffs have suffered minimal damages from the loss of use of the converted assets. An award of prejudgment

interest would therefore greatly exceed Plaintiffs' damages from the loss of use of the converted assets and would be inappropriate. Plaintiffs are therefore not entitled to recover prejudgment interest.

## G. DEFENDANT'S DEFENSES

147. A number of Defendant's affirmative defenses have been rendered moot because the Court found that no contract existed between Plaintiffs and Salke. Defendant also argued that Plaintiffs cannot recover funds that were invested from retirement accounts under Federal Rule of Civil Procedure 17(a)'s real party in interest requirement, because 26 U.S.C. § 408(a) prohibited those transactions, and because those Plaintiffs have unclean hands. Defendant also asserted an estoppel defense (first collateral, then judicial), and finally argued that he is entitled to an offset or credit for assets given to or still held by Plaintiffs.

### 1. REAL PARTIES IN INTEREST, PROHIBITED TRANSACTIONS, UNCLEAN HANDS

148. Defendant argued that Manley lacked standing to bring this action in either his individual capacity, or as the administrator of his Individual Retirement Account ("IRA"), and the action should have been brought by the trustee or custodian of his IRA under 26 U.S.C. § 408(a). Trial Tr. Day 5 Afternoon at 62–63 (Defendant's Closing Argument). Defendant similarly argued that Plaintiff "Peter A. Feinstein MD, Director and Trustee of the Peter A. Feinstein Profit Sharing Plan" is a qualified profit sharing plan and not the real party in interest, even though the money all came from that account. Def.'s FOF at 34–35. If the Court understands Defendant's argument, IRAs and qualified profit sharing plans are prohibited from investing in collectibles, antique coins count as collectibles under 26 U.S.C. § 408(m), such investments are treated as distributions from the IRA, and claims based on distributions must be brought by Manley and Feinstein in their individual names. *Id.* at 34–36. The Court has some difficulty in reconciling these contradictory positions on whether Manley can bring his claims as an individual, and Defendant cites no case supporting either position.

Regardless, the Court is satisfied that this action was prosecuted by the appropriate parties because these Plaintiffs participated in all of the underlying contracts and discussions, and took these actions for their own benefits. *See Deem v. Baron*, No. 2:15-CV-00755-DS, 2016 WL 8230425, at *2 (D. Utah Apr. 14, 2016) (finding that plaintiffs were real parties in interest instead of the unrelated custodian of the ROTH IRA because plaintiffs were the most knowledgeable of the facts and circumstances of the case, were parties to the underlying contracts that formed the action, and those contracts were done for their benefit). Rule 17(a)'s purposes also would not be served by dismissal of any claims here because there is no realistic risk that Salke might face similar actions from Feinstein individually, or from the custodians of Feinstein's profit sharing plan or Manley's IRA. *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1208 (9th Cir. 1975) ("The basic purpose of the rule requiring that every action be prosecuted by the real party in interest is to protect a defendant from subsequent similar actions by one not a party to the initial action.").

149. Defendant also argued at trial that IRAs and qualified profit sharing plans are prohibited from investing in collectibles under 26 U.S.C. § 408(m), and as a consequence these were illegal contracts that were void *ab initio*. Trial Tr. Day 3 Afternoon II at 44–46 (Defendant's Motion for Judgment as a Matter of Law). Defendant argued that the law treated Plaintiffs' investment in collectibles the same as it would treat a contract to purchase a stolen item. *Id.* Defendant offered no support for this argument, and the Court rejects it. Whatever the significance of 26 U.S.C. § 408(m) to this case, it clearly does not immunize outright fraud.

150. Defendant finally argued that the agreement to engage in a prohibited transaction by purchasing collectibles shows that those Plaintiffs have unclean hands. Trial Tr. Day 5 Afternoon at 62–63 (Defendant's Closing Argument). The Court disagrees. "Not all wrongful conduct constitutes unclean hands. Only if the misconduct is directly related to the cause at issue can a defendant invoke the doctrine." *Aguayo v. Amaro*, 213 Cal. App. 4th 1102, 1110 (2013). Defendant did not meet its burden to show that, even if Plaintiffs

did engage in prohibited transactions, it was even remotely related to Salke's breach of fiduciary duty or conversion.

## 2.   JUDICIAL OR COLLATERAL ESTOPPEL

151. Defendant appears to have made three different arguments regarding estoppel in the PTCO, at trial, and in their proposed findings of fact. The Court chooses to look past any waiver or forfeiture and address each of these defenses on the merits below.

152. In the PTCO Defendant argued that (1) Plaintiffs should be estopped from exercising any put because Salke offered to purchase Plaintiffs' claims and Plaintiffs did not respond, and (2) Plaintiffs' decision to levy the Salke's bank accounts constituted an election of remedies and Plaintiffs should now be estopped from pursuing contract remedies. PTCO at 18. This argument fails because the Court has found Salke liable only for torts, and the Court found that there was no valid contract that contained a put.

153. Defendant's counsel argued that collateral estoppel or issue preclusion should apply to Plaintiffs' conversion claim because, if Salke was a partner in F&S, then the default judgment Plaintiffs obtained against Freeman and F&S in the *Freeman Action* on their conversion precludes relitigation of that claim. Trial Tr. Day 4 Afternoon II at 32–33, Day 5 Afternoon at 62–62 (Defendant's Closing Argument). This argument fails because the Court found both that Plaintiffs had abandoned their argument that Salke was a partner in F&S, and that on the merits Salke was not a partner in F&S.

154. Defendant did not raise the issue of collateral estoppel in his proposed findings. Instead, Defendant argued for the first time that judicial estoppel applied to Plaintiffs' conversion claim because Plaintiffs alleged in the *Freeman Action* that the Freemans kept the proceeds of the sale of the coins, or never delivered the coins. Def.'s FOF at 43. This argument also fails. The first element of judicial estoppel is that "a party's later position must be clearly inconsistent with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citation and quotation marks omitted). In the *Freeman Action*, Plaintiffs' conversion claim was limited to the coins that those defendants had sold and then kept a majority of the proceeds for themselves. *Freeman Action*, Compl. ¶ 33, Dkt.

1. The conversion claim in this case is for coins that Salke had control over but then converted himself. The two sets of coins are mutually exclusive because if Salke received the coins then it means that the Freemans had not converted them, and by November 15, 2013, Salke had exclusive control over the collateral assets and confirmed they were either in the safe deposit box or storage facility. Because these two positions are not clearly inconsistent judicial estoppel is not applicable.

### 3. OFFSET OR CREDIT

155. Defendant argued that he is entitled to various offsets or credits due to payments already received by Manley, as well as certain antiques currently held by Plaintiffs' counsel. Def.'s FOF at 36–37. The Court explained above why Salke is not entitled to an offset for the antiques being held by Plaintiffs' attorney.

156. The Court disagrees that Defendant's liability to Manley should be offset by the amount that Manley has received because there is no evidence that these payments were related to either of the claims for which Defendant has been found liable to Manley. For example, the payment that Manley received from the sale of some of the Columbus coins by Heritage House derives from coins which Salke took from the safety box and turned over to Plaintiffs' counsel. Salke never owned a share in these coins, he did not convert them, and they are entirely unrelated to any damages from his breach of his fiduciary duties. Defendant is this not entitled to an offset due to payments received by Manley.

### H. DAMAGES

157. At trial, Plaintiffs chose not to articulate different theories of damages for each of their claims. Instead, Plaintiffs pursued the same exact damages for all of their claims. Plaintiffs' counsel explained in his opening statement that:

> We are here to try to enforce the agreements with Mr. Salke and, in
> particular, the 110 percent put, here to collect from Mr. Salke damages for
> his breach of his oral and written agreements, here to collect from Mr.
> Salke for the conversion of the coins [ . . . ] we accept those valuations that

were put forth by Mr. Salke and agreed to by Mr. Salke [in the S&L and MOU]. The plaintiffs invested $1,050,000. They are out $1,050,000, and that plus prejudgment interest and the 10 percent put, that's what they request from Mr. Salke.

Trial Tr. Day 1 Morning at 26–27 (Plaintiffs' Opening Statement); *see also* Trial Tr. Day 5 Afternoon at 43 (Plaintiffs' Closing Argument); Pls.' FOF ¶¶ 102, 114, 126, 139–142.

158. Although not identified as such, Plaintiffs' requested damages appear to correspond to the amount they would be owed if they had invested in the Subject Collections and immediately exercised their puts. However, Plaintiffs provided no explanation for how these damages were supported by the evidence or remedies related to each claim.

159. For the reasons explained above, on the fiduciary breach claim Manley is entitled to $61,016 and Feinstein is entitled to $77,288.

160. For the reasons explained above, on the conversion claim Manley is entitled to $244,297, Feinstein is entitled to $309,442, and Neuger is entitled to $130,291.

## III.    CONCLUSION

161. The Court finds in favor of Plaintiff Win Neuger and against Defendant Alan Salke on Neuger's claim for conversion and awards damages in favor of Neuger in the amount of $130,291. The Court finds against Neuger on his claims for fraud, breach of fiduciary duty, and breach of contract.

162. The Court finds in favor of Plaintiff Marshall Manley, an individual and Administrator of the Marshall Manley Roth IRA, and against defendant Alan Salke on Manley's claims for breach of fiduciary duty and conversion and awards damages in favor of Manley in the amount of $305,313, which includes the amount assigned to Manley by his son. The Court finds against Manley on his claims for fraud and breach of contract.

163. The Court finds in favor of Plaintiff Peter A. Feinstein, MD., Director and Trustee of the Peter A. Feinstein MD PC Profit Sharing Plan, and against defendant Alan Salke on Feinstein's claims for breach of fiduciary duty and conversion and awards damages in

favor of Feinstein in the amount of $386,730. The Court finds against Feinstein on his claims for fraud and breach of contract.

164. Plaintiffs shall submit a proposed judgment in accordance with these findings within 14 days.

DATED:     June 20, 2018

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT JUDGE